UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

RAYMOND WILLARD,               )
                              )
          Plaintiff,          )
                              )
v.                            )          No. 3:15-CV-7-PLR-CCS
                              )
CAROLYN W. COLVIN,            )
Acting Commissioner of Social Security,  )
                              )
          Defendant.          )

## REPORT AND RECOMMENDATION

This case is before the undersigned pursuant to 28 U.S.C. § 636(b), Rule 72(b) of the

Federal Rules of Civil Procedure, and the Rules of this Court for a report and recommendation

regarding disposition by the District Court of Plaintiff's Motion for Summary Judgment and

Memorandum in Support [Docs. 11 & 12] and Defendant's Motion for Summary Judgment and

Memorandum in Support [Docs. 14 & 15].  Raymond Willard ("the Plaintiff") seeks judicial

review of the decision of the Administrative Law Judge ("the ALJ"), the final decision of the

Defendant Carolyn W. Colvin, Acting Commissioner of Social Security ("the Commissioner").

On January 30, 2009, the Plaintiff filed an application for disability insurance benefits

("DIB") and supplemental security income ("SSI"), claiming a period of disability with an

amended onset date of March 1, 2007.  [Tr. 146, 155-58].  After his application was denied

initially and upon reconsideration, the Plaintiff requested a hearing.  [Tr. 61].  On January 19,

2010, a hearing was held before an ALJ to review determination of the Plaintiff's claim.  [Tr. 30-

60].  On November 5, 2010, the ALJ found that the Plaintiff was not disabled [Tr. 10-29], and

the Appeals Council denied the Plaintiff's request for review.  [Tr. 1-6].  Thereafter, the Plaintiff

sought judicial review of the final decision of the Commissioner, and the District Court, by

agreement of the parties, entered an order remanding the case to the ALJ pursuant to sentence four of 42 U.S.C. § 405(g). [Tr. 618-19].

Upon remand, a second hearing was held before the ALJ on August 5, 2013. [Tr. 562-90]. On December 24, 2013, the ALJ found for a second time that the Plaintiff was not disabled. [Tr. 537-562]. The Appeals Council, again, denied the Plaintiff's request for review [Tr. 520-24]; thus, the decision of the ALJ became the final decision of the Commissioner.

Having exhausted his administrative remedies, Plaintiff filed a Complaint with this Court on January 8, 2015, seeking judicial review of the Commissioner's final decision under Section 205(g) of the Social Security Act. [Doc. 1]. The parties have filed competing dispositive motions, and this matter is now ripe for adjudication.


I.      ALJ FINDINGS

The ALJ made the following findings:

>   1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.
>
>   2. The claimant has not engaged in substantial gainful activity since March 1, 2007, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).
>
>   3. The claimant has the following severe impairments: lumbosacral, cervical and thoracic spondylosis without myelopathy; remote history of left ACL and meniscus repair; remote history of left shoulder arthroscopy; arthritis; alcohol abuse; polysubstance abuse; tobacco abuse; bipolar I disorder; anxiety disorder; personality disorder (20 CFR 404.1520(c) and 416.90(c)).
>
>   4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925

2

and 416.926).

5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). The claimant can lift and carry, push and pull 20 pounds occasionally and 10 pounds frequently. With normal breaks in an 8-hour day, he can sit for 6 hours and stand and/or walk for 4 hours; can never climb ladders, ropes or scaffolds; can occasionally climb ramps and stairs; can occasionally balance, stoop, kneel, crouch and crawl; can tolerate occasional exposure to vibration; and can tolerate frequent bilateral handling and fingering. The claimant is limited to performing simple, routine non-detailed tasks, where there is no general public contact, where coworker contact is casual and occasional; where supervision is direct and non-confrontational, and where changes in the workplace are infrequent and gradually introduced.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on March 21, 1963 and was 43 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from March 1, 2007, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

3

12.  I have carried out the directives of the Appeals Council Order dated October 3, 2012, which is set out in part in the Jurisdiction section, above, and is found in its entirety at Exhibit 8A.

[Tr. 543-55].


## II.    DISABILITY ELIGIBILITY

This case involves an application for DIB and SSI benefits.  An individual qualifies for DIB if he or she: (1) is insured for DIB; (2) has not reached the age of retirement; (3) has filed an application for DIB; and (4) is disabled.  42 U.S.C. § 423(a)(1).  To qualify for SSI benefits, an individual must file an application and be an "eligible individual" as defined in the Act.  42 U.S.C. § 1382(a); 20 C.F.R. § 416.202.  An individual is eligible for SSI benefits on the basis of financial need and either age, blindness, or disability.  See 42 U.S.C. § 1382(a).

"Disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a).  A claimant will only be considered disabled if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); see 20 C.F.R. §§ 404.1505(a), 4015.905(a).

Disability is evaluated pursuant to a five-step analysis summarized as follows:

4

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity ("RFC") and vocational factors (age, education, skills, etc.), he is not disabled.

Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 529 (6th Cir. 1997) (citing 20 C.F.R. § 404.1520). The claimant bears the burden of proof at the first four steps. Id. The burden shifts to the Commissioner at step five. Id. At the fifth step, the Commissioner must prove that there is work available in the national economy that the claimant could perform. Her v. Comm'r of Soc. Sec., 203 F.3d 388, 391 (6th Cir. 1999) (citing Bowen v. Yuckert, 482 U.S. 137, 146 (1987)).


III.    STANDARD OF REVIEW

When reviewing the Commissioner's determination of whether an individual is disabled pursuant to 42 U.S.C. § 405(g), the Court is limited to determining "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." Blakley v. Comm'r of Soc. Sec., 581 F.3d 399, 405 (6th Cir. 2009) (citing Key v. Callahan, 109 F.3d 270, 273 (6th Cir. 1997)). If the ALJ applied the correct legal standards and

5

his findings are supported by substantial evidence in the record, his decision is conclusive and must be affirmed. 42 U.S.C. § 405(g); Warner v. Comm'r of Soc. Sec., 375 F.3d 387, 390 (6th Cir. 2004). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994) (citing Kirk v. Secretary of Health & Human Servs., 667 F.2d 524, 535 (6th Cir. 1981)) (internal citations omitted); see also Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison v. NLRB, 305 U.S. 197, 229 (1938)).

It is immaterial whether the record may also possess substantial evidence to support a different conclusion from that reached by the ALJ, or whether the reviewing judge may have decided the case differently. Crisp v. Sec'y of Health & Human Servs., 790 F.2d 450, 453 n.4 (6th Cir. 1986). The substantial evidence standard is intended to create a "'zone of choice' within which the Commissioner can act, without the fear of court interference." Buxton v. Halter, 246 F.3d 762, 773 (6th Cir. 2001) (quoting Mullen v. Bowen, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, the Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984) (citing Myers v. Richardson, 471 F.2d 1265 (6th Cir. 1972)).

In addition to reviewing the ALJ's findings to determine whether they were supported by substantial evidence, the Court also reviews the ALJ's decision to determine whether it was reached through application of the correct legal standards and in accordance with the procedure mandated by the regulations and rulings promulgated by the Commissioner. See Wilson v. Comm'r of Soc. Sec., 378 F.3d 541, 544 (6th Cir. 2004).

On review, the plaintiff "bears the burden of proving his entitlement to benefits." Boyes

6

v. Sec'y. of Health & Human Servs., 46 F.3d 510, 512 (6th Cir. 1994) (citing Halsey v. Richardson, 441 F.2d 1230 (6th Cir. 1971)).

## IV. POSITIONS OF THE PARTIES

On appeal, the Plaintiff contends that the ALJ erred in four respects. First, the Plaintiff argues that the ALJ erred by finding his peripheral neuropathy was a non-severe impairment. [Doc. 12 at 3-7]. Second, the Plaintiff argues that the ALJ failed to properly address treatment notes and opinions made by various medical sources. [Id. at 9-13]. In addition, the Plaintiff maintains that the ALJ failed to properly assess his credibility. [Id. at 13-16]. Finally, the Plaintiff argues that the ALJ's reliance on the consultative and state agency medical sources was improper because these sources did not consider the combination of the Plaintiff's impairments. [Id. at 16-18].

The Commissioner counters that substantial evidence supports the ALJ's evaluation of the severity of the Plaintiff's peripheral neuropathy. [Doc. 15 at 5-6]. The Commissioner also maintains that substantial evidence supports the ALJ's evaluation of the opinion evidence of record. [Id. at 6-10]. Moreover, the Commissioner argues that the ALJ properly assessed the Plaintiff's credibility by considering his work history, daily activities, inconsistent statements, and evidence of exaggerated statements and symptoms. [Id. at 11-13]. Lastly, the Commissioner contends that the ALJ, not the consultative and state agency sources, are charged with considering the combination of impairments, and that the Plaintiff's residual functional capacity ("RFC") properly accounts for the effects of the Plaintiff's impairments, both singularly and in combination. [Id. at 14-16].

## V.    ANALYSIS

The Court will address the Plaintiff's allegations of error in turn.

### A.    Severe Impairment

The Plaintiff argues that his diagnosis of peripheral neuropathy was a severe impairment, and that the ALJ's failure to find the impairment severe, as well as its limiting effects on the Plaintiff's RFC, constitutes reversible error.  [Doc. 12 at 4].  The Plaintiff cites treatment notes from Gregg Kesterson, M.D., and Sam Kabbani, M.D., as evidence demonstrating that his neuropathy was more severe than found by the ALJ.  [Id.].

On January 31, 2012, the Plaintiff was seen by Dr. Kesterson for neurological abnormalities, including numbness and tingling in his hands and legs.  [Tr. 866-67].  The Plaintiff was referred to Dr. Kabbani for further evaluation, at which time the Plaintiff reported constant numbness and tingling to the point that his left leg would go out, causing him to fall.  [Tr. 732].  On March 28, 2012, upon examination, the Plaintiff experienced deceased sensation to all modalities, and an EMG and nerve conduction test was positive for mild peripheral polyneuropathy in his bilateral extremities.  [Tr. 733, 739-42].  Despite treatment by medication, the Plaintiff related during his follow-up appointments on May 30, 2012, and August 22, 2012, with Dr. Kabbani that he continued to experience symptoms of neuropathy, including numbness in his extremities, leg weakness, and falling two to three times a week.  [Tr. 726-28].  On March 27, 2013, the Plaintiff complained that his symptoms were only getting worse.  [Tr. 893].

At step two in the disability decision, the ALJ acknowledged that the Plaintiff had received a diagnosis of idiopathic peripheral neuropathy but found that the impairment was non-severe because it did "not cause more than a minimal physical limitation beyond the limitation

8

caused by other severe impairments of record." [Tr. 544]. At step four, the ALJ summarized the Plaintiff's treatment with Dr. Kabbani, noting that an evaluation was conducted on March 28, 2012, due to complaints of numbness and tingling in the Plaintiff's extremities, and that a nerve study revealed mild peripheral polyneuropathy. [Tr. 548]. The ALJ concluded that during a follow-up visit on May 30, 2012, Gabapentin was noted as "somewhat" helping the Plaintiff's symptoms. [Id.].

The Plaintiff relies on the treatment notes from Dr. Kabbani to argue that the ALJ's dismissal of the severity of the Plaintiff's neuropathy is not supported by substantial evidence, and that the RFC determination, which assessed that the Plaintiff had the ability to tolerate frequent bilateral handling and fingering, is contrary to the medical evidence. [Doc. 12 at 5-6]. The Commissioner points out that the Plaintiff's diagnosis was not made until five years after his alleged onset date, and that the medical evidence that predates treatment with Dr. Kabbani fails to diagnosis or indicate symptoms of neuropathy. [Doc. 15 at 5].

As mentioned above, at step two of the sequential evaluation, "the ALJ must find that the claimant has a severe impairment or impairments" to be found disabled. Farris v. Sec'y of Health & Human Servs., 773 F.2d 85, 88 (6th Cir. 1985). To be severe, an impairment or combination of impairments must "significantly limit[] your physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). Step two has been described as "a *de minimis* hurdle" in that an impairment will be considered non-severe "only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." Higgs v. Brown, 880 F.2d 860, 862 (6th Cir. 1988) (citing Farris, 773 F.2d at 90).

The Court finds that the ALJ did not err in finding that the Plaintiff's neuropathy was a non-severe impairment. While Dr. Kabbani's treatment notes admittedly appear to demonstrate

9

that the Plaintiff's impairment presented more than a slight abnormality, the Plaintiff's diagnosis and associated symptoms did not occur until January 2012, two years after the Plaintiff's insured status expired. Our appellate court has explained that "[e]vidence of disability obtained after the expiration of insured status is generally of little probative value," Strong v. Soc. Sec. Admin., 88 F. App'x 841, 845 (6th Cir. 2004), unless the post-dated evidence "relate[s] back to the claimant's condition prior to the expiration of [his] date last insured," Wirth v. Comm'r of Soc. Sec., 87 F. App'x 478, 480 (6th Cir. 2003) (citing King v. Sec'y of Health and Human Servs., 896 F.2d 204, 205-06 (6th Cir. 1990)). Moreover, the post-dated evidence must do more than confirm a diagnosis or signal that the claimant suffered from a condition; the evidence must be demonstrative of the claimant's actual limitations and ability to do work during the relevant time period. Higgs, 880 F.2d at 863.

Here, Dr. Kabbani's treatment notes are ultimately irrelevant as they do not bear on the Plaintiff's condition prior to his date last insured. See Weetman v. Sullivan, 877 F.2d 20, 22 (6th Cir.1989) (holding that the deterioration in a claimant's condition after the period of eligibility is irrelevant); see also Begley v. Mathews, 544 F.2d 1345, 1354 (6th Cir. 1976) ("Medical evidence of a subsequent condition of health, reasonably proximate to a preceding time, may be used to establish the existence of the same condition at the preceding time"). The Court has not found, and the Plaintiff has not shown, any medical evidence that would suggest that the Plaintiff suffered from neuropathy, or presented with complaints of numbness and tingling, prior to his last date insured, such that Dr. Kabanni's treatment notes could reasonably be argued as relating back to the relevant time period in question.

Accordingly, the Court finds the Plaintiff's assignment of error is not well-taken.

10

## B.    Opinion Evidence of Record

### 1.    *Global Assessment of Functioning ("GAF") Scores*

The Plaintiff contends that certain GAF scores were not properly considered by the ALJ. [Doc. 12 at 9-10].    The Plaintiff points to GAF scores of 45, 47, 48 and 49[1], that he received from Helen Ross McNabb during treatment between February and August 2010.  [Id.].  The Plaintiff argues that the ALJ erred by attributing these scores to "other sources," because David Manning, M.D., who conducted the Plaintiff's initial psychological evaluation, electronically co-signed the treatment notes that documented these scores, and therefore, the scores represent medical evidence from an "acceptable medical source."[2]    [Id. at 10].

The Commissioner argues that not only did the Plaintiff fail to allege any mental impairment as a basis of disability, substantial evidence supports the ALJ's critique of the Plaintiff's GAF scores.  [Doc. 15 at 7].  The Commissioner further contends that treatment notes co-signed by Dr. Manning is insufficient to transform the GAF scores into opinions from an "acceptable medical source."  [Id. at 8].

In the disability decision, the ALJ explained that the Plaintiff began mental health treatment with Helen Ross McNabb in February 2010, and while Dr. Manning provided the initial psychological evaluation, treatment was conducted by "other sources," including nurses and other assistants.  [Tr. 548].  During the Plaintiff's first appointment and psychological evaluation, the Plaintiff received GAF scores of 45 and 47 from Dr. Manning, a social worker,

---

[1] A score ranging between 41 and 50 indicate serious symptoms or serious impairment in social, occupational, or school functioning.  Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34, 4th ed. (revised) 2000.

[2] "Acceptable medical sources," which include licensed physicians and psychologists, are sources that may provide evidence to establish a medically determinable impairment.  20 C.F.R. §§ 404.1513(a), 416.913(a).  By contrast, "other sources," which include nurse-practitioners and physicians' assistants, cannot establish the existence of a medically determinable impairment, but they may provide evidence as to the severity of an impairment and its work-related limitations.  Id.

11

and a medical assistant, but the ALJ explained that these scores were assessed before the Plaintiff started any treatment. [Tr. 548]. Although the Plaintiff received additional GAF scores of 45, 47, 48, and 49 during the course of treatment through August 2010, the ALJ noted that the Plaintiff was not taking Celexa which had been prescribed to him. [Tr. 549]. On August 12, 2010, the Plaintiff was assessed a GAF score of 49, but the ALJ related that the Plaintiff had missed his prior appointment, he had ran out of his medication, Abilify, and he continued to miss appointments thereafter until February 2012. [Id.]. Other than the one GAF scored assigned by Dr. Manning during the initial psychological evaluation, the ALJ attributed the remaining scores to "other sources." [Tr. 548-49].

The Court finds no merit in the Plaintiff's contention that the GAF scores were erroneously attributed to "other sources" rather than Dr. Manning following the Plaintiff's psychological evaluation. The treatment notes make clear that the individuals who actually conducted the Plaintiff's appointments and assessed the GAF scores were various nurses and medical assistants. [Tr. 335, 339, 348]. This is specifically indicated on the top of each treatment note under "Provider" and further evidenced by their signature at the end of each treatment note. [Tr. 335-36, 339-40, 348-49]. Additionally, the Plaintiff fails to cite any support for the proposition that medical evidence authored from "other sources" can be transformed into evidence from an "acceptable medical source" if a medical doctor or other acceptable source merely co-signs the treatment records. The Court declines to establish such a broad based rule where it is evident, in this case, that the Plaintiff's GAF scores at issue were exclusively based upon the clinical observations from the nurse or medical assistant who happened to examine and conduct the Plaintiff's appointment.

Even if the GAF scores could reasonably be attributed to Dr. Manning, the Court finds

12

that the source of a GAF score, alone, does not make the score more or less credible. "A GAF is a clinician's subjective rating of an individual's overall psychological functioning. A GAF score may help an ALJ assess mental RFC, but it is not raw medical data." Kennedy v. Astrue, 247 F. App'x 761, 766 (6th Cir. 2007). The Commissioner has specifically "declined to endorse the [GAF] score for 'use in the Social Security and SSI disability programs,' and has indicated that [GAF] scores have no 'direct correlation to the severity requirements of the mental disorders listings.'" DeBoard v. Comm'r of Soc. Sec., No. 05–6854, 2006 WL 3690637, at *4 (6th Cir. Dec. 15, 2006) (quoting Wind v. Barnhart, No. 04–16371, 2005 WL 1317040, at *6 n.5 (11th Cir. June 2, 2005) (quoting 65 Fed. Reg. 50746, 50764–65 (Aug. 21, 2000)).

Regardless of the source of the GAF scores, the Court finds that substantial evidence supports the reasons articulated by the ALJ for finding the scores less than fully credible. The Plaintiff's failure to follow prescribed treatment, not only in terms of failing to take the medication he was prescribed [Tr. 335, 338], but also in attending scheduled appointments [Tr. 333, 831, 832], diminishes the significance a GAF score may otherwise offer where a claimant has been compliant and consistent with treatment recommendations. As related by the ALJ [Tr. 549], Helen Ross McNabb terminated treatment with the Plaintiff on May 30, 2011, for non-compliance with scheduled appointments to manage his symptoms. [Tr. 830]. Thereafter, the Plaintiff did not receive any mental health treatment until he established care with Cherokee Health Systems a year and a half later on February 12, 2012, over a year after his insured status expired. [Tr. 744-45]. A lack of medication and treatment compliance, without good reason, provides valid grounds for finding the Plaintiff's claims of disabling pain or symptoms less than fully credible. See Lawson v. Comm'r of Soc. Sec., 192 F. App'x 521, 527-28 (6th Cir.2006) (upholding a denial of benefits where "the ALJ held that 'Lawson's credibility with respect to

13

her symptoms and impairments in significantly diminished by her failure to follow-up with recommendations of treating physicians to seek psychiatric or mental health treatment [and] failure to take medications as prescribed . . . .'"").

As a final matter, this Court has held that "because a GAF score can be based on any of a number of different factors, it is not probative of a claimant's occupational functioning unless it is explicitly based on the scoring clinician's assessment of the claimant's work capacity." Ott v. Astrue, No. 3:09-CV-166, 2010 WL 3087421, at *9 (E.D. Tenn. June 30, 2010) adopted by No. 3:09-CV-166, 2010 WL 3087420, at *1 (E.D. Tenn. Aug. 5, 2010). Not only does the Plaintiff's lack of compliance call into question the accuracy of his GAF scores, but no treatment provider who assigned a GAF score opined that the score was specifically reflective of the Plaintiff's work-related limitations. Thus, the scores fail to undermine the ALJ's RFC determination.

Accordingly, the Court rejects the Plaintiff's contention.

### 2. Jeff Scarbrough, MA

Next, the Plaintiff argues that the ALJ failed to adequately address the opinion of Mr. Scarbrough. [Doc. 12 at 10]. During the Plaintiff's initial appointed with Helen Ross McNabb on February 25, 2010, Mr. Scarbrough provided a functional assessment of the Plaintiff's impairments. [Tr. 351-53]. In the area of daily living activities, Mr. Scarbrough opined that the Plaintiff was moderately limited due to self-reported difficulties completing daily activities attributed to the Plaintiff's irritability toward others and mood instability. [Tr. 351]. As to interpersonal functioning, the Plaintiff was assessed with marked limitations because he reported he does not have much support in his life and further isolated himself from the community. [Id.]. In regard to concentration, task performance, and pace, the Plaintiff was found to be markedly limited due to self-reports of poor concentration and difficulty with focus and memory. [Tr. 351-

14

52]. Finally, Mr. Scarbrough opined that the Plaintiff was markedly limited in adapting to change because increased stress led to the Plaintiff experiencing increased symptoms of irritably and violence toward others. [Tr. 352].

The ALJ gave Mr. Scarbrough's opinion "partial weight insofar as it supports the residual functional capacity." [Tr. 552]. The ALJ continued, "I give it less weight because it is inconsistent with the other medical evidence of record." [Id.].

As an initial matter, the Court notes that the Plaintiff fails to articulate how the ALJ erred in his treatment of Mr. Scarbrough's opinion. Simply disagreeing with the weight assigned to a medical source's opinion is not grounds for reversal. The Plaintiff's failure to develop any argument in support of his contention may be treated as a waiver of the issue. See Hollon v. Comm'r of Soc. Sec., 447 F.3d 477, 499-91 (6th Cir. 2006) (declining "to formulate arguments" or "undertake an open-ended review of the entirety of the administrative record" on behalf of a plaintiff who neither provides an argument or an analysis). Nonetheless, the Court's own review of the ALJ's treatment of Mr. Scarbrough's opinion fails to yield any reversible error.

While the ALJ's discussion of Mr. Scarbrough's opinion is brief, the discussion cannot be read in isolation but must be read in conjunction with the other mental health records that were discussed in detail by the ALJ. This is particularly true not only because the ALJ found Mr. Scarbrough's opinion inconsistent with "the other medical evidence of record," but because this other evidence largely consists of treatment notes from Helen Ross McNabb where the Plaintiff was seen by other staff in addition to Mr. Scarbrough. As noted by the ALJ, Mr. Scarbrough's opinion was made when the Plaintiff first presented to Helene Ross McNabb. [Tr. 548]. Thus, the opinion fails to provide a longitudinal window of the Plaintiff's functional limitations as the opinion was rendered prior to developing any sort of meaningful treating

15

relationship with the Plaintiff. Second, while Mr. Scarborough and other provides assigned GAF scores that indicated serious psychological symptoms, the Plaintiff was not consistent in receiving treatment, nor was he compliant with taking his medication as previously discussed. [Tr. 548-49]. In addition, during the Plaintiff's last appointment with Helen Ross McNabb prior to losing his insured status, he reported paying $600.00 a month in rent, a lack of income, an interest in hunting and fishing in his free time, and no interest in school or work. [Tr. 332]. The ALJ noted that the Plaintiff's statements suggested a motivation for filing for disability in an effort to seek income generally. [Tr. 548-49]. Finally, the ALJ discussed a March 13, 2013, psychological consultative examination with C. Randall May, M.D., wherein Dr. May assessed mild to moderate limitations in regard to the Plaintiff's ability to understand, remember, and carry out instructions and mild to moderate limitations in his ability to interact appropriately with others and respond to routine changes in the workplace. [Tr. 834-35]. Based upon the Plaintiff's self-report, Dr. May opined that the Plaintiff's functional limitations appeared to be primarily related to his physical, rather than mental conditions. [Tr. 841]. In sum, the Court finds that the ALJ's discussion of the foregoing evidence fails to substantiate the more limiting opinion offered by Mr. Scarbrough.

Therefore, the Court finds that the ALJ properly weighed Mr. Scarbrough's opinion.

### C.    Robbie McDaniel, APRN-BC

The Plaintiff also argues that the ALJ's decision fails to mention the opinion of Mr. Daniel who completed an "Attending Physician's Statement" on January 8, 2013. [Doc. 12 at 11]. Mr. Daniel, who treated the Plaintiff from May 2011 through November 2012, related that the Plaintiff suffered from chronic pain, including lumber back pain, anxiety, and depression, which was supported by objective findings, including "grimacing, flat affect, and general

16

malaise." [Tr. 924]. Mr. Daniel diagnosed the Plaintiff with bipolar disorder, lumbar degenerative disc disease, and anxiety and opined that the Plaintiff is disabled and unable to perform even sedentary work. [Id.]. The Plaintiff argues that the ALJ erred by not mentioning this report in the disability decision. [Doc. 12 at 11].

The Commissioner points out that Mr. Daniels is an "other source," and even if he were a medical doctor, opinions on whether a claimant is disabled can never be entitled to controlling weight because it is an issue reserved for the Commissioner. [Doc. 15 at 9]. In addition, the Commissioner states that Mr. Daniel's opinion could not possibly be credited because it contains no medical findings and virtually no explanation for the findings opined. [Id.].

"While it might be ideal for an ALJ to articulate his reasons for crediting or discrediting each medical opinion, it is well settled that: '[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'" Kornecky v. Commissioner of Social Security, 167 F. App'x 496, 507–08 (6th Cir. 2006) (quoting Loral Defense Systems–Akron v. N.L.R.B., 200 F.3d 436, 453 (6th Cir. 1999)); see Boseley v. Comm'r of Soc. Sec., 397 F. App'x 195, 199 (6th Cir. 2010) ("Neither the ALJ nor the Council is required to discuss each piece of data in its opinion, so long as they consider the evidence as a whole and reach a reasoned conclusion."). The Court finds that the ALJ's failure to mention Mr. Daniel's opinion does not mean he did not consider it. The Court also agrees with two points raised by the Commissioner. First, opinions on whether a claimant is disabled "will not be given any special significance" because whether an individual meets the statutory definition of disability is an issue strictly reserved for the Commissioner. 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3). Second, Mr. Daniel offers no support for his opinion other than noting "grimacing, flat affect, and general malaise" as objective findings supporting his opinion.

17

Without any documented support that could explain the conclusions reached by Mr. Daniel, such as medical records containing observations and treatment history, the opinion fails to undermine the ALJ's RFC determination. The Plaintiff likewise fails to direct the Court to any evidence within the record that could reasonably explain the findings reached by Mr. Daniel. Finally, the Court observes that Mr. Daniel did not begin treating the Plaintiff until May 2011, five months after the Plaintiff's insured status expired. There is no indication that Mr. Daniel's 2013 opinion, even if it were well-supported, is reflective of the Plaintiff's condition prior to his date last insured, thereby rendering the opinion of "little probative value." See Strong, 88 F. App'x at 845.

Therefore, the Court finds no merit in the Plaintiff's assignment of error.

### 4. Nathan Slayer, PA-C

Finally, the Plaintiff argues that while the ALJ acknowledged that he had received treatment from Mr. Slayer, the ALJ did not fairly evaluate Mr. Slayer's treatment records. [Doc. 12 at 11]. The Commissioner responds that the ALJ properly considered the records, and that the Plaintiff's RFC takes into account the findings made by Mr. Slayer. [Doc. 15 at 10].

Mr. Slayer treated the Plaintiff beginning in February 2009 due to complaints of left knee pain and a history of back problems. [Tr. 310]. X-rays showed retained screws in the Plaintiff's distal femur and proximal tibia from prior ACL reconstruction, but no significant abnormalities or arthritic change. [Id.]. Evidence of degenerative changes in the Plaintiff's lower half of the lumber spine was also evident due to slight anterior shift of the L4 on L5. [Id.]. An MRI confirmed "L5/S1 degenerative changes with spurring and disc bulge with some compression of the S1 nerve root to the right." [Tr. 308]. Mr. Slayer advised the Plaintiff that he would need to follow-up with a neurosurgeon and may even need surgery to take care of the nerve compression

18

problem.  [Id.].  The Plaintiff declined the referral, relating insurance problems and a concern that he may be dropped by his insurance carrier over the next several weeks.  [Id.].  The Plaintiff returned on September 28, 2009, at which time further x-ray studies of the Plaintiff's left shoulder revealed "[l]eft shoulder AC joint and advanced glenohumeral joint arthritis."  [Tr. 305].  Mr. Slayer opined that short of lower back and left shoulder surgery, the Plaintiff would continue to experience shoulder and back problems, which would most likely worsen over time. [Id.].

The ALJ summarized the foregoing medical evidence provided by Mr. Slayer, specifically noting the x-ray and MRI results revealing disc bulging, nerve root compression, and arthritis in the left knee, as well as complaints made by the Plaintiff in regard to pain and neuropathy.  [Tr. 548].  The ALJ related that despite the Plaintiff's complaints, "he refused referral to a neurosurgeon."  [Id.].  The ALJ also noted that upon examination, the Plaintiff was negative for straight leg raises, had no instability in his neck, lower back, or lower extremities, he could touch his fingertips to mid-shin, had full range of motion in his cervical spine, and that both of his knees were stable.  [Id.].

The only error the Plaintiff appears to allege is that the ALJ did not properly consider the reason for the Plaintiff's refusal to see a neurosurgeon, *i.e.*, a lack of healthcare insurance.  [Doc. 12 at 13].  The Plaintiff argues that he has done his best to obtain medical treatment and if he cannot afford treatment, his impairments "must be evaluated without regard to remediability if [he] has no means to pay for remedial treatment."  [Id.].  The Court finds no error in the ALJ's discussion of Mr. Slayer's treatment notes.

While treatment notes suggest the Plaintiff anticipated being dropped by his insurance, they do not confirm that he was.  To the contrary, the record demonstrates, and the ALJ

19

discussed [Tr. 547], that the Plaintiff was in fact seen by a neurosurgeon. The Plaintiff presented

to Paul C. Peterson, M.D., at Neurosurgery Clinic of Knoxville, PLLC on April 13, 2011, by

referral from Mr. Slayer. [Tr. 720-24]. After a neurosurgical evaluation, which included a

physical exam and review of past and current imaging studies, Dr. Peterson opined that the

Plaintiff did not need surgical intervention, that "most of [the Plaintiff's] problems are age

appropriate degenerative changes," and that there was nothing that needed to be done from a

surgical standpoint. [Tr. 712, 720]. Therefore, the Court finds that the Plaintiff's contention that

the ALJ failed to properly consider his inability to afford treatment from a neurosurgeon is

without merit.

Accordingly, the Plaintiff's contention in this regard must also fail.


### C.     Credibility Assessment

The Plaintiff contends that the ALJ improperly attacked his credibility based on his work

history and alcohol and drug abuse history. [Doc. 12 at 13-16]. In this regard, the ALJ stated the

following in the disability decision:

> I note that during the last fifteen years, from 1998 to 2013, the
> claimant has only worked at substantial gainful activity levels for
> five of those thirteen years, which signifies a weak employment
> motivation and in turn weakens his contentions that but for his
> medically determinable impairments he would be working.
> Specifically, the claimant earned a substantial gainful activity
> levels from 1998 through 2001 and in 2006. Even before the
> claimant's alleged onset date of March 1, 2007, he had not earned
> substantial gainful level income in 2002, 2003, 2004 and 2005.
> (Exhibit 6D).
>
> The claimant claims an alleged onset date of disability of March 1,
> 2007. On March 13, 2013, the claimant told consultative examiner
> C. Randall May, MD that he was working for his father's paving
> company up until the time he hurt his shoulder, knee, and back,

20

and he last worked there in 2008 (24F/5). The record does reflect income in all four quarters of 2007 and some income in 2008, despite an alleged onset date of March 1, 2007 (6D).

. . . .

On March 20, 2012, in a treatment visit at Cherokee Health Systems, with Gregory Perry, MD, the claimant reported a long history of alcohol abuse. He stated in the past that he was consuming alcohol daily. He told Dr. Perry he has reduced his alcohol use, implying he was still drinking, albeit on a reduced basis (21F/9). On March 13, 2013, in a mental consultative examination with Dr. May, the claimant was unclear about his alcohol use, saying it had been 7 to 8 years since he had drunk alcohol, but then he said he drinks about 8 to 10 beers and because it is on a boat it does not count (24F/3). I asked him about this at the hearing and he said his family rented a yacht and had a family gathering thereon where he did drink some beers (Hearing Testimony)

The record shows additional substance abuse. Drug screen in September 2008 was positive for marijuana use (Exhibit 3F, 17F). On March 20, 2012, in a treatment visit at Cherokee Health systems with Gregory Perry, MD, the diagnoses were bipolar disorder, NOS and cannabis abuse (21F/9). On the same day, the claimant denied a history of a seizure disorder.

[Tr. 551-52].

The Plaintiff argues that since 2002, he has had a variety of serious medical condition that prevented him from working, and points to a treatment note from May 2002, in which Preston Phelps, M.D., recommended that the Plaintiff explore short term disability options with his employer and apply for Social Security disability as a long term option. [Doc. 12 at 14 (citing Tr. 847)]. The Plaintiff maintains that the ALJ improperly attacked his work history as Dr. Phelps' treatment note demonstrates that the Plaintiff could not work regularly after 2002, and that although the Plaintiff worked some thereafter, including after his alleged onset date of

21

2007, he should not be penalized for having the courage or determination to continue working despite his disabling condition. [Id. at 15].

The Commissioner argues that the ALJ properly found the five year gap in employment, from between 2002 and the Plaintiff's alleged onset date, suspect because the Plaintiff offers no explanation for this gap in employment, and despite Dr. Phelps' recommendation to apply for disability benefits, the Plaintiff went on to earn $30,000.00 in 2006. [Doc. 15 at 11]. The Commissioner further argues that the Plaintiff's work history was only one factor the ALJ considered when he assessed the Plaintiff's credibility. [Id.].

A claimant's work history is an appropriate factor that may be weighed in assessing credibility. See 20 C.F.R. § 404.1529(c)(3) (explaining that in evaluating the intensity and persistency of symptoms, evidence about a claimant's prior work may be considered). The Court recognizes that a good work history may bolster a claimant's credibility, see White v. Comm'r of Soc. Sec., 312 F. App'x 779, 789 (6th Cir. 2009) ("White's extensive work history and attempts to continue working despite his disability support his credibility . . . ."), whereas a poor work history "might stem from [an] inability to work as easily as [an] unwillingness to work," Schaal v. Apfel, 134 F.3d 496, 502 (2d Cir. 1998). It is undisputed that the Plaintiff had a good work history through 2001. The issue is whether the ALJ could properly draw an adverse inference from the lack of work that occurred thereafter until March 1, 2007, the Plaintiff's alleged onset date. The Court finds that it was well within the ALJ's prerogative as fact finder to conclude that the Plaintiff's lack of employment between 2002 and his alleged onset date represented a lack of motivation, rather than an inability, to work.

While the Plaintiff was advised to apply for disability in 2002 by Dr. Phelps, and alleges his impairments were too disabling to maintain consistent employment from that point forward,

the fact of the matter is the Plaintiff did not apply for disability benefits until January 30, 2009, and alleged an onset date of March 1, 2007, not 2002. Moreover, the fact that the Plaintiff worked in 2006 at a level of substantial gainful activity, earning $30,237.01 [Tr. 136], belies the Plaintiff's contention that his impairments since 2002 were too severe for him to maintain employment. Thus, the Court is unable to find, as a matter of law, that the ALJ erred in concluding that the Plaintiff's work history reflected negatively upon his credibility. See Vance v. Comm'r of Soc. Sec., No. 07–5793, 2008 WL 162942, at * 6 (6th Cir. Jan. 15, 2008) (holding that "it squarely is *not* the duty of the district court, nor this court, to re-weigh the evidence, resolve material conflicts in testimony, or assess credibility.") (emphasis in original).

The Plaintiff also argues that the ALJ improperly focused on the Plaintiff's history of alcohol and drug abuse. [Doc. 12 at 16]. Citing 20 C.F.R. § 404.1535(b)(1)[3], the Plaintiff argues that the record is void of substantial evidence that would indicate that the Plaintiff's impairments would be significantly different had he stopped using drugs or alcohol. [Id.]. The Commissioner argues that the ALJ's discussion of the Plaintiff's alcohol and drug abuse was appropriate because it was discussed in the context of the Plaintiff making a number of inconsistent statements throughout the record. [Doc. 15 at 12].

The Court finds the Plaintiff's reliance on 20 C.F.R. § 404.1535 misplaced. In relevant part, section 404.1535 provides, "*If we find that you are disabled* and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability." 20 C.F.R. § 404.1535(a) (emphasis added). Here, the ALJ did not make a finding of disability, and therefore,

_____

[3] The regulation provides, "[t]he key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol." 20 C.F.R. § 404.1535(b)(1).

23

section 404.1535 is inapplicable. See Gayheart v. Comm'r of Soc. Sec., 710 F.3d 365, 380 (6th Cir. 2013) ("[s]ubstance abuse is not considered until the Commissioner first makes a finding that a claimant is disabled.") (citing id.). Therefore, the Court finds that the ALJ's discussion of the Plaintiff's inconsistent statements regarding his alcohol and drug use was an appropriate factor the ALJ weighed in assessing the Plaintiff's credibility. See Swart v. Astrue, No. 1:11-CV-28, 2011 WL 6749840, at *6 (S.D. Ohio Dec. 2, 2011) adopted by No. 1:11-CV-28, 2011, WL 6751932 (S.D. Ohio Dec. 22, 2011) (holding that the ALJ was not prohibited from considering the plaintiff's inconsistent statements concerning his alcohol abuse because "inconsistent statements are routinely considered in assessing credibility").

### D. Combination of Impairments

Finally, as to the last assertion of error, the Plaintiff argues that the ALJ's reliance on the consultative and state agency medical sources was improper because these sources did not consider the combination of the Plaintiff's impairments. [Doc. 12 at 16]. The Plaintiff objected, both in a pre-hearing brief and at the beginning of the administrative hearing, to the ALJ considering this evidence. [Id. at 17]. The ALJ stated he would take the objection under advisement [Tr. 565], but the Plaintiff argues that the ALJ never made an explicit ruling on the objection in violation of agency policy which dictates that adjudicators will rule on any objections presented. [Doc. 12 at 17].

The Commissioner argues that only the ALJ, not consulting or state agency medical sources, are charged with considering the combination of a claimant's impairments. [Doc. 15 at 14]. To hold otherwise, argues the Commissioner, would be illogical because it would require medical sources to render opinions on areas outside of their expertise. [Id.]. While the ALJ did

24

not make an explicit ruling on the Plaintiff's objections, the Commissioner argues that the ALJ implicitly denied the Plaintiff's objection by considering the sources' opinions in the disability decision. [Id. at 15]. Moreover, the Commissioner points out that the ALJ did not rely on any one medical opinion and assessed greater physical and mental limitations than those opined by the consultative and state agency medical sources. [Id.].

As to the Plaintiff's contention that consultative and state agency physicians or psychologists have a duty to consider the combination of the Plaintiff's impairments, the Court disagrees. The Plaintiff cites no support for the proposition, and Social Security regulations are clear that the ALJ, not a medical source, is charged with considering the severity and effects of a claimant's impairment both singularly and in combination. See 20 C.F.R. §§ 404.1523, 416.923 (explaining "*we* will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity" in determining whether a physical or mental impairment or impairments are of listing level severity.) (emphasis added). Moreover, common sense dictates that a consultative examiner or state agency physician employed to consider a claimant's exertional limitations is not medically trained to also render exacting opinions on the mental impairments and restrictions that the same claimant may have, which is why a separate consultative or state agency psychologist is often employed to opine on a claimant's non-exertional limitations.

An ALJ is presumed to have considered a claimant's impairments in combination by virtue of considering all of the medical evidence of record. See Gooch v. Secretary of Health and Human Servs., 833 F.2d 589, 592 (6th Cir.1987) (per curiam), cert. denied, 484 U.S. 1075 (1988). Here, the ALJ explicitly stated that he consider all the Plaintiff's symptoms and opinions of record in forming his decision. [Tr. 546]. In addition, the ALJ discussed a number of alleged

medical conditions the Plaintiff experienced [Tr. 544-53], and he specifically stated that the combination of the Plaintiff's impairments were considered. [Tr. 544 ("[T]he medical evidence of record sufficiently establishes the claimant's impairments, and they are cumulatively 'severe' within the meaning of the Regulations because they cause 'more than minimal' limitations of the claimants ability to perform work-related activities."); 545 ("The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medially equal the criteria of listings 12.04 and 12.06."); see Loy v. Sec'y of Health & Human Servs., 901 F.2d 1306, 1310 (6th Cir. 1990) ("An ALJ's individual discussion of multiple impairments does not imply that he failed to consider the effect of the impairments in combination, where the ALJ specifically refers to a 'combination of impairments' in finding that the plaintiff does not meet the listings.") (internal quotation omitted). Therefore, the Court finds that the ALJ properly considered the combination of the Plaintiff's impairments.

Turning to the ALJ's failure to rule on the Plaintiff's objection, the Court finds that any error in this regard was harmless. The Court may decline to reverse and remand the Commissioner's determination if it finds that the ALJ's procedural errors were harmless. An ALJ's violation of the Social Security Administration's procedural rules is harmless and will not result in reversible error "absent a showing that the claimant has been prejudiced on the merits or deprived of substantial rights because of the [ALJ]'s procedural lapses." Connor v. U.S. Civil Serv. Comm'n, 721 F.2d 1054, 1056 (6th Cir. 1983) (citations omitted). Thus, an ALJ's procedural error is harmless if his ultimate decision was supported by substantial evidence and the error did not deprive the claimant of an important benefit or safeguard. See id. at 547.

As discussed above, the ALJ, not the consultative and state agency physicians and psychologists, was tasked in considering the combination of the Plaintiff's impairments.

26

Moreover, while the ALJ considered the challenged medical opinions, the ALJ gave the Plaintiff the benefit of the doubt by finding that he was more limited than opined by the consultative and state agency sources. For example, Eva Misra, M.D., who performed a consultative examination in 2009, opined that the Plaintiff had no impairment-related physical limitations [Tr. 272-74], and Molly Chatterjee, M.D., a non-examining state agency physician, likewise opined no physical medically determinable impairments. [Tr. 275-78]. The ALJ declined to adopt these opinions and instead credited the Plaintiff's testimony by finding that the Plaintiff's lumbosacral, cervical, and thoracic spondylosis without myelopathy was severe. [Tr. 552]. As to opinions regarding the Plaintiff's mental limitations, a psychological consultative examination was performed by Jodie Castellani, Ph.D., in June 2009, in which Dr. Castellani deferred giving a diagnostic impression, opining that the Plaintiff was not a reliable historian and should be administered a test for malingering. [Tr. 279-86]. The following month, non-examining state agency psychologist Andrew Phay, Ph.D., opined there was insufficient evidence for a Psychiatric Review Technique. [Tr. 288-300]. The ALJ, however, assigned no weight to either opinion, finding that subsequent medical evidence indicated severe mental impairments. [Tr. 553]. Finally, the most recent psychological consultative examination, which was performed by Dr. May in 2013, found only mild to moderate limitations in the Plaintiff's ability to understand, remember, and carry out instructions, make workplace decisions and judgments, and deal with and interact with others. [Tr. 834-41]. Dr. May further opined that the Plaintiff's primary medical problems were physical in nature based upon the Plaintiff's self-report. [Tr. 841]. Despite the foregoing opinions, the ALJ nonetheless found that the Plaintiff's bipolar, anxiety, and personality disorders were severe impairments, and restricted the Plaintiff's RFC accordingly in light of these impairments. [Tr. 544, 546].

Given the ALJ's treatment of the consultative and state agency opinions, in addition to properly considering the combination of the Plaintiff's impairments, the Court finds that remanding the case for the ALJ to rule of the Plaintiff's objection would serve no meaningful purpose. See Kobetic v. Comm'r of Soc. Sec., 114 F. App'x 171, 173 (6th Cir. 2004) ("When 'remand would be an idle and useless formality,' courts are not required to 'convert judicial review of agency action into a ping-pong game.'") (quoting NLRB v. Wyman–Gordon Co., 394 U.S. 759, 766 n.6 (1969)).

Accordingly, the Court finds the Plaintiff's allegation in this regard is not well-taken.

## VI.    CONCLUSION

Based upon the foregoing, it is hereby **RECOMMENDED**[4] the Plaintiff's Motion for Summary Judgment [**Doc. 11**] be **DENIED** and the Defendant's Motion for Summary Judgment [**Doc. 14**] be **GRANTED**.

Respectfully submitted,

        s/ C. Clifford Shirley, Jr.
United States Magistrate Judge

---

[4] Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Civ. P. 72(b)(2). Such objections must conform to the requirements of Rule 72(b), Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. Thomas v. Arn, 474 U.S. 140 (1985). The district court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive or general. Mira v. Marshall, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370 (6th Cir. 1987).